# Magee Estate

*William H. S. Wells*, of Saul, Ewing, Remick & Saul, for accountant.

BOLGER, J., November 4, 1954.—Anna J. Magee died December 12, 1923, leaving a will and several codicils probated February 20, 1924, by the Register of Wills of Philadelphia County. She appointed the Pennsylvania Company for Insurances on Lives and Granting Annuities (now the Pennsylvania Company for Banking and Trusts) executor and trustee. The first account of the executor was audited and adjudicated by Thompson, J., on January 21, 1925, wherein he awarded the residue of $285,154, together with pecuniary legacies of $600,000 and $400,000 making a total of $1,285,154 to the trustee for the purposes of the trust. This fund, as well as the income therefrom, has been invested by the trustee and now exceeds $6,100,000.

This is the first account of the trustee. In addition to the necessity of auditing the account, the auditing judge is asked to pass upon a petition by the trustee, joined in by the board of trustees of the Magee Memorial Hospital, to approve a claimed credit in the account of $5,000 advanced by the trustee to the board to start the performance of the latter's duty of establishing and maintaining the hospital. The trustee's request is most unusual. It evidences the lengthy and careful consideration given over a period of years by the board to the delicate problem of fulfilling their great responsibilities in the most proper and effective manner. The trustee and the board might well have accepted sole responsibility of embarking upon these duties without consultation or authority of the court,

but they seek approval of the court acting in its capacity as visitor of all charitable trusts: Wilson v. Board of City Trusts, 324 Pa. 545.

The auditing judge is reluctant to accept the petition because in large part the court's province is one of review and not of advising preliminarily. Ordinarily, the only procedure to obtain advance court approval in such instances is by seeking a declaratory judgment. Here the facts apparently do not constitute grounds for a declaratory judgment, because there is no imminence of litigation or any of the other requisite factors present: Lifter Estate, 377 Pa. 227. However, because the problem involves an expenditure by the trustee, however minute (and largely a matter of form), for which it claims credit, and the auditing judge believes the requirements of the exercise of our visitorial responsibility over charitable trusts calls for the court's action, he accepts jurisdiction of the petition.

The auditing judge observes that the policies, plans and programs suggested in the petition are largely an outline with some specifics included. It is not his purpose in passing upon the merits of this petition to impinge upon the prerogatives of the board, but to express his conclusions and reasons in support thereof as to the construction of Miss Magee's testamentary intention. It is Miss Magee's will that must be carried out. Therefore, neither the board nor the auditing judge should be controlled in formulating judgments as to what Miss Magee wanted by extraneous considerations such as the existing conditions generally, National, State or local, which can be served by this benefaction. Such factors must all be solved within the framework of Miss Magee's will. As an illustration, it would be gravely doubtful if patients sent by the Bureau of Rehabilitation of the Pennsylvania Board of Vocational Education could be accepted by Magee

Hospital unless they were poor Philadelphians discharged from Philadelphia hospitals. This is not a public trust nor does it emanate from a National, State or city authority. It is a private benefaction whose objects and subjects are clearly stated and they must be fulfilled since they are legal and practicable.

In her codicil dated February 1, 1917, testatrix set forth the purposes of the trust as follows:

"It is my desire to commemorate my family name by rendering lasting service to the poor and by increasing the usefulness of the hospitals in my native city, Philadelphia.

"In order that my purpose may be accomplished, I desire to found and endow an institution to be called 'The Magee Memorial Hospital for Convalescents,' whose object shall be the relief of the general hospitals of the City of Philadelphia from the burden of the support of patients who have passed through the active stages of acute illness or have recovered from injuries or operations, during a portion of that time which must necessarily elapse before they are able to resume their accustomed occupations or duties. In furnishing this relief, relief will also be furnished the families of such persons from the burden of their support during such period."

She then provided that the institution shall receive patients without regard to sex, color, nativity or religion, excluding, however, children under the age of 14 years. She also excluded patients suffering from contagious or from incurable diseases and provided that when patients in Magee Hospital develop relapses or other signs of acute illness, they must be returned to the hospital from which they came to be treated by such hospital under the terms under which they were originally admitted.

The sum of $600,000 in the codicil of February 1, 1917, was directed to be held and used for the procure-

ment of a proper site which "I desire to be an inexpensive one and not on the Main Line, and to erect a building and to add to, enlarge and extend the same." Provision is made for the preparation of plans and construction to insure the highest degree of reasonable comfort and healthfulness of the inmates and in accordance with every modern requirement. The building shall be stately and dignified, but no money shall be misused for architectural ornament. Over the principal portal there shall be placed in letters of gold the inscription, "Ad Dei Gloriam", and that the portraits of Miss Magee's parents will be hung in the place indicated by the will.

To manage the institution she named a board of 12 trustees to be selected, respectively, by the following hospitals: Protestant Episcopal, Presbyterian, Methodist, Episcopal, Pennsylvania, German (now Lankenau), Jefferson Medical College, University of Pennsylvania, Woman's, Samaritan (now Temple University), Hahnemann and Germantown Dispensary and Hospital. As the twelfth member of the board she named Dr. James Cornelius Wilson, professor emeritus of the practice of medicine and clinical medicine in the Jefferson Medical College, or his successor, at Jefferson. Vacancies are to be filled as provided in the will. The income of the trust is to be paid to the treasurer of the board of trustees, to be disbursed under the direction of the board in and about the management, care and maintenance of the hospital. The treasurer shall also receive all principal sums required from time to time for the purchase of the site and erection of buildings or improvements or extensions of the same and to be disbursed by him under the order of the board.

At the audit of the present account the corporate trustee, joined in by the board of trustees, presented a petition to the court to approve the plans and projects

enumerated in the petition for the fulfillment of testatrix's purposes. From that petition, the averments of which the court accepts without question, it appears that following the adjudication of the executor's account and the award of the fund to the corporate trustee, the board of trustees provided for in the will was duly appointed and convened first on June 2, 1925. At this meeting a committee was appointed by the board to plan the establishment of the hospital and to report back to the board. On October 4, 1927, the committee reported that it was not practicable to build the institution projected in the will and under the terms of the trust until a larger fund was accumulated. On January 16, 1928, the trustees accepted this recommendation of the committee and resolved that land and buildings should be purchased from income and since income was not sufficient to pay the operating expenses of a hospital, that the operation of a hospital should not begin until the fund increased to $2,500,000.

Thereafter, the trustees met annually from 1929 to 1935 and received reports on the size of the fund. At the board meeting on February 1, 1937, the fund had reached $2,666,879, as a result of which a committee was appointed to consider the purchase of the Orthopedic Hospital at Seventeenth and Summer Streets, Philadelphia. On November 9, 1938, the board received a report from the committee that neither the location nor the Orthopedic Hospital was suitable. This report was accepted and the committee was directed to continue its search. On October 30, 1939, the committee recommended that the trustees approve the purchase of a tract of land about 15 acres adjoining Fairmount Park between Ridge and Henry Avenues in Philadelphia for a sum not to exceed $51,500. The committee approved the purchase of the land. The land was purchased and settlement therefor was held on December 28, 1939, the cost being $49,739. On Jan-

uary 2, 1941, additional land for an entrance was purchased for $2,620. On October 30, 1945, an additional adjoining tract was purchased for $12,262. At the meeting held January 16, 1941, preliminary plans and estimates were submitted and the execution of contracts with an architect and contractor were authorized. At the meeting on September 16, 1941, a decision was made to postpone construction because of war conditions. From 1942 to 1946 the board met annually, but suspended action due to war conditions. At the meetings held in 1946, 1947 and 1948, construction was discussed, but it was considered not feasible because of excessive cost of labor and materials. In 1948 the board considered whether real need existed for the usual and conventional type of convalescent hospital. At its meeting on December 29, 1949, the board authorized Dr. C. Rufus Rorem, executive secretary of the Hospital Council of Philadelphia to survey and report to the board on the type and kind of institution which the trustees should erect.

Dr. Rorem accepted the assignment and visited all Philadelphia hospitals and seven nonprofit convalescent hospitals in eastern Pennsylvania and New Jersey as well as nursing homes. He also traveled to New York and to other places in order to inform himself on existing conditions and needs. In a report dated April 1950 he recommended to the board that it establish as a hospital for modern care of convalescents "a rehabilitation center" and for research and professional education in physical medicine and rehabilitation. This report was accepted in principle by the board at its meeting on June 8, 1950, and the board appointed a committee to formulate plans.

The petition recites that Dr. Rorem reached a number of conclusions, among which are the following: That new methods of treatment including ambulation accelerates not only the recovery but the convalescence

of patients, but there has been a decrease in the use of passive convalescent homes. The general hospitals have been referring fewer patients to them; that the income of convalescent funds in Philadelphia is not being fully used for convalescent patients; that a passive convalescent hospital of a conventional type would merely duplicate much of the work now being performed by existing nonprofit convalescent hospitals; the visiting nurse service provides presently for important convalescent home care and that such service may ultimately remove the need for custodial convalescent care; rehabilitation is a modern form of active convalescence for former patients of general hospitals, and that an active program of rehabilitation for those who have received the maximum benefits of medicine and surgery would afford relief to general hospitals and to the families of the patients; that rehabilitation has resulted in the lives of numbers of disabled and handicapped persons, who previously would have died, being prolonged, etc. The report recommended the establishment of a hospital for modern care of convalescents, a rehabilitation center for service research and professional education in physical medicine and rehabilitation. Dr. Rorem conducted a further study and survey at the request of the special committee, wherein he discussed the practical aspects of establishing and conducting a rehabilitation center, emphasized the urgent need of such a center in the over-all picture of this area of the country and submitted recommendations as to the form of organization and professional and administrative policies, together with budgets for income, expense and capital investment.

The special committee accepted these recommendations and expressed the opinion that such a hospital would be consistent with Miss Magee's wishes and submitted Dr. Rorem's proposals to the board of trustees.

This report was approved on May 8, 1951. The trustees are of the opinion that it would not be prudent to attempt to construct and operate a convalescent hospital of the usual and conventional type; that there is no need at present for such a hospital because of the changing trends in convalescent care and the need for such hospitals may continue to decrease. They believe that the fund is sufficient to establish a convalescent hospital devoted to a rehabilitation program; that such a hospital would meet a need for the modern treatment of certain type of convalescents and that such a hospital would render lasting service to the poor and increase the usefulness of the hospitals of Philadelphia and relieve them of the burden of the support of certain patients. The board, therefore, asks the approval of the court of its decision to spend a sum not exceeding $750,000 for the establishment of a convalescent hospital of the kind described in the petition by constructing a new building or by purchasing or leasing and renovating an existing building, or by purchasing the necessary equipment; the income of the balance of the fund to be used by the board for the maintenance of the hospital. The petition concludes with the expression of the board's desire to report to the court every five years the result of the operations of the hospital so that the court may consider from time to time the advisability of the continuance of the program outlined in the petition.

It appears that the trustees have sold, subject to the approval of the court, the tracts of land purchased near Fairmount Park at a price which absorbed all of the expense and maintenance.

On November 8, 1951, the auditing judge appointed Thomas B. K. Ringe, Esq., as amicus curiae to scrutinize the account of the trustee with powers of a master, with authority to advertise his appointment, conduct hearings, make such investigation and inquiry

as may enable him to prepare and present to the court appropriate reports with recommendations concerning the approval of the account and as to the action which the court should take with respect to the prayer of the trustee's petition and thereafter from time to time, but at intervals of not less than five years, to make further reports with recommendations until further order of the court.

Mr. Ringe graciously accepted the auditing judge's appointment and promptly proceeded to study testatrix's will, scrutinize the account which reflects some losses and to inquire into the subject matter of the trustee's petition. He made personal visits to many institutions, traveled to New York and elsewhere and thereafter held hearings, advertising them in advance, and giving notice of them to the trustees and to individuals and organizations in this area who could shed light on the purposes of the petition. Among those who appeared in support of the prayer of the petition were Doctor Rorem, Dr. Howard A. Rusk, who is no doubt the country's outstanding leader in the field of physical medicine and rehabilitation and who is chairman of the department of physical medicine at New York University College of Medicine and director of the institute of physical medicine and rehabilitation, New York University—Bellevue Medical Center; Dr. Richard A. Kern, professor of medicine at Temple University, School of Medicine; Dr. Francis C. Wood, professor of medicine and chairman of the department of medicine at the University of Pennsylvania School of Medicine; Dr. William H. Schmidt, head of the department of physical medicine and associate professor of physical medicine at Jefferson Medical College; Dr. Donald C. Smelzer, executive director of the Lancaster General Hospital, Lancaster, Pa., and past president of the American Hospital Association; Dr. Lucius R. Wilson, administrator of Episcopal Hospi-

tal and past president of American Hospital Administrators; Mary E. Switzer, director, Office of Vocational Rehabilitation, Federal Security Agency, Washington, D. C.; Màrk M. Walter, director of the Bureau of Rehabilitation of the Pennsylvania State Board of Vocational Education; Owen B. Stubben, Deputy Commissioner of Health, City of Philadelphia; Rt. Rev. Monsignor Leo G. Fink, representing the Most Rev. John F. O'Hara, archbishop of Philadelphia; Dr. Pascal F. Lucchesi, executive vice president and medical director of the Albert Einstein Medical Center and formerly superintendent and medical director of the Philadelphia General Hospital; James M. Brittain, Esq., vice president of the Mercy-Douglass Hospital; Dr. Russell F. Minton, superintendent of the Mercy-Douglass Hospital; Wayne L. Hopkins, executive secretary of the Armstrong Association; Hobart C. Jackson, administrator of the Home for Aged and Infirm Colored Persons; Kermit J. Hall, business manager of the Mercy-Douglass Hospital; Dr. Leslie Pinckney Hill, chairman of the public relations committee of the Mercy-Douglass Hospital and formerly head of the Cheyney School; Charles H. Frazier, president of the Pennsylvania Citizens Association for Health and Welfare; G. Ruhland Rebmann, Jr., Esq., president of the Health and Welfare Council of Philadelphia; Elizabeth K. Lammie, executive director of the Pennsylvania branch of the Shut-In Society; Olga Tattersfield, director of Social Service, Hospital of Woman's Medical College of Pennsylvania; Mrs. Amy Guest Kohlhas, owner and operator of a private convalescent and nursing home, as well as the members of the board of trustees of the Magee Memorial Hospital for Convalescents.

The amicus curiae was supplied as was the auditing judge with copies of Dr. Rorem's reports to the board of trustees.

Mr. Ringe filed his first report with the court on March 26, 1953, and attached to it testimony taken before him as well as numerous exhibits. Therein Mr. Ringe stated that the witnesses unanimously were in accord with the purposes expressed in the petition. The eminence and professional standing of the witnesses who testified before the amicus curiae attest to the outstanding importance of testatrix's project and the court is much indebted to them for their interest. Of particular importance is the detailed testimony of Doctor Rorem and of Doctor Rusk, who kindly came over from New York on two occasions to testify. The amicus curiae unqualifiedly recommended in his first report the granting of the prayer of the trustee's petition.

The auditing judge thereafter consulted with the amicus curiae and suggested to him that the opinion of additional specialists as well as of nonprofessionals in the field of rehabilitation be obtained; that further consideration be given to the extent to which research and teaching may be employed as well as the right of the hospital to charge for its services and of the trustee to add to the principal of the trust from sources other than the estate of testatrix. Accordingly, Mr. Ringe conducted further hearings, after consultation with William H. S. Wells, counsel for the corporate trustee and with other responsible persons in Philadelphia, including Joseph McDonough, president of the American Federation of Labor; William Kelly, president of the Congress of Industrial Organizations in the Philadelphia area; other labor leaders, the executive heads of certain large industrial and commercial businesses of Philadelphia employing large numbers of persons; E. A. Van Steenwyk, director of the Associated Hospital Service of Philadelphia, generally known as Blue Cross; Harold B. Hess, president of the Board of Trustees of Willow Crest for Convales-

cents, and other specialists in the field of industrial medicine. Mr. Wells conferred with Dr. Josephine J. Buchanan, former medical director of the Woodrow Wilson Rehabilitation Center in Virginia and presently chief of physical medicine and rehabilitation at the District of Columbia General Hospital and assistant professor of the board of the George Washington University Medical Center. As a result of these conferences, a further hearing was fixed for Tuesday, January 12, 1954, and notice sent to all parties believed to be interested. The hearing was held as notified and an adjourned meeting held on Tuesday, January 19, 1954. Without intending to minimize the testimony of the other witnesses who appeared on the latter occasion, the auditing judge, as well as the amicus curiae and the trustees, appeared to be most interested in the testimony given by Doctor Buchanan.

Dr. Josephine J. Buchanan, who is diplomate of the Medical Board of Physical Medicine and Rehabilitation, formerly medical director of Woodrow Wilson Rehabilitation Center in Virginia, presently chief of physical medicine and rehabilitation of the District of Columbia General Hospital and assistant professor and member of the board at the George Washington University Medical Center, testified that there are 1,500 beds in the Washington, D. C., General Hospital; that in 1950 the hospital, in conjunction with the United States Health Service, Division of Chronic Diseases, the District Health Department and the District Department of Physical Rehabilitation met to discuss and solve the problem of long-term illness, its effect upon the hospital and the community, economically, socially, vocationally, etc. The principal target was the long term case occupying a bed needed for an acute patient. The present project was set up a result of this discussion. As a result, 3,000 patients with some degree of disability have passed through the

treatments. Sixty-one percent have become entirely independent and able to resume their former occupations; 21 percent remain partially dependent and need some job adjustment or some brace or appliance, but all are able to make their way financially. The remainder have been absorbed in the home or in institutional care. Doctor Buchanan emphasized the resultant savings to the hospital, to the community as five times the cost put into the project. This project is a separate unit, constituting a referral service for physical restorative medicine, social service, home nursing, vocational rehabilitation and guidance, counselling and placement. It serves as a hub for coördinating all aspects of care for disabled persons to restore them to productive activity. She stated the hard core of the problem is severely disabled persons, but that there must be a continuity in the doctor's service in total medical care; that there should be an integrated program with all hospitals and rehabilitation centers; that if there is no teaching provided by a center, the quality of care will be inferior. She stated the less disabled cases are cared for in the hospitals. They are not needed at the Magee Hospital; that there should be two types of beds, the first a hospital ward bed similar to an infirmary with nursing care and limited therapy. From there the patient would graduate to a dormitory bed with a minimum of care necessary. She stated that the age of specialization is breaking down; that the doctor today does not treat a disease or a broken bone, but is concerned with the individual. The treatment is only one aspect. When the disease is cured or the bone healed, the patient must be returned to normal life; that passive convalescence is out today and has been superseded by dynamic convalescence; that passive convalescence does not serve the patient because the patient must be active and rest is not the cure. She indicated that the indigent who

have no homes or where home conditions are not propitious for convalescence could be taken care of in the dormitory section. The total problem is getting people back to work. She stated that today the indigent and the wealthy get excellent medical care whether in the acute or convalescent stage. The middle class find it more difficult. She suggests that because of the expense the plans should be to prevent indigency in long and serious illness rather than wait for indigency to be forced upon the patient. She emphasized that after the acute stage of treatment is finished and the patient is unable to return to his normal occupation, he probably needs restoration of his functions and assistance in new kinds of work. She stated that it is the tendency to refer to the Washington project only the more dramatic cases; this must be avoided.

Mr. Ringe's second report following further investigation and the taking of additional testimony was filed on October 18, 1954. In this report as well as in his first report Mr. Ringe recommends the granting of the trustee's petition for the reasons therein set forth. In this recommendation he is joined by Thomas Hart, Esq., chairman of the board of trustees, who stated, inter alia:

"The trustees recognize very definitely that in order to comply with the provisions of Miss Magee's will, it is essential that they look upon this field in its entirety and not only of the specialized dramatic category."

Among the suggestions of Doctor Rorem, all of which were approved by the trustees, some dealt with the launching of the hospital. He suggested, inter alia, that after a further period of study and planning, not more than $750,000 be spent on the construction or acquisition or rental of an existing building and the equipping of it; that it be maintained out of the income of the balance of principal for a trial period of

two years, at the end of which time other money might be sought for permanent operation. During these two years the area of service would be ascertained and the essential liaison and coordination with the Philadelphia hospitals and other rehabilitation services be established. This report was rendered in 1950 and approved by the board in 1951. Doctor Rorem's recommendations were found by the amicus curiae to be valid and the auditing judge approves them with one exception. Since four years or more have elapsed since they were made, building costs have increased and much more has been learned about convalescent and rehabilitation service and, therefore, of the essential equipment that will be required. Furthermore, the fund has been greatly enhanced and now amounts to in excess of $6,100,000. It would, therefore, be most unwise to put a ceiling at this time on the amount of principal to be spent on the acquisition or construction and equipping of the hospital. The auditing judge, therefore, makes no finding respecting that item, but reserves it to the good judgment of the board.

The intention of testatrix is the pole star in the construction of this will: Lyman Estate, 366 Pa. 164, and Lyle Estate, 374 Pa. 344. Miss Magee displays unique vision back of which there must have been constant and intense preparation and study. The many revisions of her will indicate an alertness to changing conditions and her constantly increasing devotion to the poor. Her memory should be permanently respected by the city and her example considered by all possessors of wealth because of her solicitude and philanthropy for the benefit of the poor working man and woman of Philadelphia, irrespective of race, color, nativity or creed. That was her main purpose.

For this reason it is our peculiarly delightful duty to interpret the express purpose as I am sure it was that of the civic minded trustees and of the amicus

curiae in formulating the plans for the execution of Miss Magee's purpose. The time consumed in this process has been most profitably employed as the extensive record discloses. It has served to crystallize the thinking of the board of trustees, the amicus curiae and the auditing judge. Had this process not been followed, it is quite possible that all concerned with the responsibility of carrying out Miss Magee's purpose might still be in the twilight rather than in the sunlight of complete understanding. In her mind, the poor of Philadelphia could be best served by helping and relieving agencies that minister to the poor, viz., the hospitals of Philadelphia.

Therefore, it is clear that in administering the trust, these two purposes must be uppermost in whatever policies, plans and programs are adopted and executed —*the maximum direct benefit* to the greatest number of the poor of Philadelphia and that which will do the utmost to relieve our hospitals. It would be folly for the auditing judge, who is not a prophet, to attempt to blueprint this purpose. The policies in operating this hospital must never become static; they must be constantly surveyed by the board so that the hospital's facilities will be best adapted to existing needs within the limitations of the hospital's facilities. However, the testimony in part recommends that this project be a pilot one in the field of physical medicine and rehabilitation where research and teaching will be uppermost in importance so that society as a whole would be benefited. The need for such a project in this area of the country was stressed. No one can detract from the high purpose involved in this idea.

The advances in the field of physical medicine and rehabilitation in this country in the last 15 years have been spectacular. The project in Washington testified to by Doctor Buchanan has returned more than 80 percent of the poor to gainful and fruitful lives, there-

by saving much of the taxpayers' money as well as relieving the patients. Doctor Rusk, who headed the United States Government's rehabilitation program for the wounded in World War II and who now heads two great institutions in New York, is one of the world's outstanding authorities in this field. His testimony is most illuminating and comforting. This work must go forward and the Magee Memorial Convalescent Hospital must do its part. Experience acquired in the Magee Hospital must be transmitted freely by instruction to students and publication for the benefit of the medical profession. Many individual cases will require original research as well as the knowledge gained from other research. The Magee Hospital must be efficiently staffed. Unless its members have adequate facilities for research and teaching, the efficiency of the staff will suffer.

As the amicus curiae states, teaching and research should be limited to that which will improve the hospital's efficiency and effectiveness. Doctor Rorem is also correct in his recommendation that opportunity might well be provided for outside students studying under grants from foundations as well as other sources, i.e., without expense to the Magee Hospital. However, research and teaching cannot be the major objective of this institution because it does not conform to Miss Magee's primary objective, which is as stated, the maximum direct benefit to the greatest number of the poor of Philadelphia and the relief of the city's hospitals.

It is clear that when Miss Magee died, the function of the physician was twofold, to diagnose and to treat the patient. Since that time the medical profession has come to accept a third phase as being just as important as the other two, viz., convalescence and rehabilitation. Similarly, at the time Miss Magee died, hospitals retained and cared for their patients beyond the acute

stage of treatment which included a large part of the convalescent stage. There was then much need for convalescent homes where the inmates were practically all ambulatory, received their meals and bed care with a minimum of nursing and practically no therapy.

Doctor Buchanan also tells us that today the age of specialization is changing so that now the physician treats not only the disease or the broken bone, but the patient as a personality and that the attending physician's service must continue to the point of the patient's complete recovery when possible, i.e., what is called the residual stage of illness. The record discloses also that ambulation is practically universal. Ambulation gets the patient on his feet as soon as possible, immediately following an operation or survival of crisis and accelerates not only his cure, but his convalescence. Generally, in operative cases, the patient is on his feet the day after the operation and is ready to leave the hospital in 10 days. A survey shows that ambulation has shortened the average stay in the hospital from 30 days in 1923 to 20 days today and thereby frees many more beds for acute cases.

It is crystal clear to the auditing judge, particularly from the testimony of Doctor Buchanan, who deals only with the poor of Washington, D. C., that there are many of the poor, especially single women and men who have no homes and others whose home conditions are unsuitable for convalescence and whose Blue Cross benefits have been exhausted and, therefore, they cannot bridge the gap between their discharge from a hospital to their full and complete ability to resume their jobs. These people may have need for minor or major therapy or there may be no therapy needed. There are many post-operative conditions and ravaging illnesses such as blood clots, heart failures and Potts fractures for which there is no need for active therapy and the only treatment is rest, observation

and nourishment in a proper environment, to permit nature to restore the damage of trauma and disease. They, however, must be accepted as patients in the Magee Hospital. The broadest based direct need of the poor of Philadelphia should be the dominating purpose at all times in the mind of the board of trustees.

Much of the testimony and the discussion by the amicus curiae in his report deals with the change of conditions in the care of convalescents since Miss Magee's death in 1923. It is pointed out that at the time of testatrix's death, passive convalescence, which involves practically no therapy and little nursing, was the accepted form of service. Since then more attention has been focused upon active convalescence, which requires therapy of many kinds, nursing and occupational retraining and guidance.

It is stated that there are several existing nonprofit convalescent homes in the Philadelphia area where beds and other facilities are not completely used which indicate a lack of need for passive convalescent service. However, it is not clear to the auditing judge that these existing homes are free to all of the classes included by Miss Magee, especially the colored population, but it is clear that this hospital was not intended by Miss Magee to be exclusively a conventional passive convalescent home. For the Philadelphia hospitals to have to wait for patients to recover to the point that merely passive convalescent care is all that is needed would afford such hospitals little relief and would undoubtedly leave the Magee Hospital with many empty beds. The trustees of this institution would, therefore, thwart Miss Magee's purpose, if such were their policy.

The learned amicus curiae also points out that Miss Magee employs the phrase "Convalescent Hospital" in describing the institution as distinguished from "Convalescent Home". The dictionary definition of

a hospital is a place where sick or injured persons are given medical or surgical treatment. This does not mean, however, that the trustees should exclude those who need only passive convalescent care. There is little doubt that our thinking on this particular phase of the subject has been clouded by our failure to appreciate that Miss Magee realized in her lifetime something which we realize as of today, but do not credit her with realizing in her time and which was the genius of her benefaction, the care for all types of convalescents, active as well as passive.

Pragmatically, it will also appear that if the present nonprofit free convalescent homes are not filled because of lack of demand for their services, there should be little fear that the Magee Hospital will find itself preoccupied with passive cases only. Hence, there is no necessity for considering this question on the basis of cy pres. The policy enunciated is what Miss Magee wanted the trustees to pursue. There is no deviation from her purpose involved.

It is clear that Miss Magee contemplated a large and comprehensive plan when she projected her benefits to include all of the hospitals of Philadelphia. It is clear from the testimony that the needs of the city are so great that even with the parallel facilities already existing in some of the Philadelphia hospitals, the Magee Hospital will not be able to take care of them. Therefore, there must be a process of selectivity involved in the acceptance of patients. As recommended, the hospital might well serve as the hub of a wheel, the spokes of which are all the Philadelphia hospitals. It will be the constant care of the trustees to funnel through these spokes patients whose requirements may embrace any aspect of the almost unlimited field of physical medicine and rehabilitation with the decision on selectivity based as indicated.

The board of trustees requests the authority of the

court to accept funds from other sources from time to time, because the will is silent as to the right of the trustee to accept funds from outside sources. The proposition poses the question of a possible distinction between an open end trust and a closed trust. Under the former a conveyor authorizes the trustee to accept other funds. In a closed trust it is a very serious question whether in the absence of such an instruction, additional funds can be added to the original res particularly from outside sources.

However, in the instant case, the auditing judge is satisfied that the corporate fiduciary or the board of trustees, through its treasurer, is authorized under the will to accept other funds. It is quite obvious that Miss Magee desired this hospital to afford as much help as possible to the poor of Philadelphia and to the relief of *all* of the city's hospitals and that its facilities should be expanded and modernized to meet increasing and changing needs. Therefore, the auditing judge finds that there is implicit in the will authority to accept other money.

Therefore, it is the opinion of the auditing judge that the corporate fiduciary may accept from time to time, either as principal or income, funds tendered by public authority, corporations or individuals for the uses and purposes of the hospital, provided however, acceptance of such funds in no way involves a change in the name of the hospital, its purposes as herein stated, or in any way impinge upon the management or administration as provided in the will. In case of doubt, the trustees should apply to the court for appropriate authority.

The board will, of course, observe the expressed conditions of the trust pertaining to the minimum age of 14 years, the lack of discriminating respecting sex, color, nativity and religion, the exclusion of contagious and chronic cases and the understanding with the

Philadelphia hospitals respecting the return to them of patients accepted by the Magee Hospital who suffer a relapse of their original ailment. As Doctor Buchanan pointed out, it should be a part of the understanding of the Philadelphia hospitals that the Magee Hospital be not made a dumping ground for undesirable cases; that they will forever retain the name "The Magee Memorial Convalescent Hospital"; that they will have placed in gold over the portal of the main entrance "Ad Dei Gloriam", and that they will hang the portraits of Miss Magee's parents in the place indicated by will.

Doctor Rorem suggests the board of trustees and the amicus curiae approve and, therefore, recommend that the Magee Hospital be authorized to accept unpaid, partially paid and fully paid patients. The auditing judge approves. However, priority must always be given to the poor. Today, the word "poor" does not necessarily mean "indigent". If patients had to be indigent as a condition for admission, the hospital might be empty. "Poor" is a relative term. A person may have funds, but his other financial or social factors may well support a finding of his being poor. As Doctors Buchanan and Lanahan testified, the cost of care of a patient must not be carried to the point of stripping him of all of his assets.

However, it is only fundamental justice that if a patient can pay, he should be required to pay. Failure of such a person to pay would be a corrupting practice. This subject, of course, is a matter of delicate administration. Because of the praiseworthy desire to operate largely from the income of the balance of trusts without loss, there may from time to time be a temptation to accept paying patients with the consequent slighting of nonpaying ones. At the same time, there must be an examination of all applicants for nonpaying status to prevent the hospital from being victimized. The court has entire confidence in the wisdom

and experience of the board of trustees in administering this phase of operation.

The auditing judge acknowledges his gratitude to the learned amicus curiae for his zeal, patient understanding and intelligent handling of this difficult and delicate case. His reports are approved.

The petition of the trustee is approved within the conclusions stated in this adjudication. Its prayers that the services of the amicus curiae be continued and that leave be granted to apply to the court from time to time to aid the trustee and the board of trustees in the development of the hospital and the administration of the trust are granted.

Annexed hereto is certification by the amicus curiae that he has served all counsel of record and all parties known to him to be interested or to have expressed an interest in the proceedings with notice to file exceptions within a reasonable time. The time fixed has elapsed and no exceptions have been filed.

The account, as supplemented, shows a balance of principal of $4,985,799.65 and a balance of income of $5,511.01, making a total balance of $4,991,310.66, which, together with income received since the filing of the account, subject to payment of $5,000 distribution heretofore shown and subject to payment to Thomas B. K. Ringe, Esq., of compensation for his services, is awarded to the accountant for the uses and purposes set forth in the will and in accordance with the provisions of this adjudication. These awards are also subject to payment to the accountant of commissions at the rate of two percent on the final distribution of any principal representing an accumulation of income.

A certificate of the official examiner as to his examination of the assets composing the fund awarded to be retained in trust will be submitted to me.

And now, November 4, 1954, the account is confirmed nisi.